## COMMONWEALTH OF VIRGINIA, EX. REL., DIVISION OF CONSUMER COUNSEL, OFFICE OF THE ATTORNEY GENERAL

V.

## THE POTOMAC EDISON COMPANY, AND STATE CORPORATION COMMISSION

Record No. 860706

March 6, 1987

Present: All the Justices

*James C. Dimitri, Assistant Attorney General (Mary Sue Terry, Attorney General; Gail Starling Marshall, Deputy Attorney General; Anthony Gambardella, Senior Assistant Attorney General,* on briefs), for appellant.

*Richard D. Gray; Wayne N. Smith (Laurence E. Skinner; Philip J. Bray; Lewis S. Minter; Hunton & Williams,* on briefs), for appellees.

THOMAS, J., delivered the opinion of the Court.

The central issue in this appeal of right from the State Corporation Commission is whether the Commission erred in setting an authorized rate of return on common equity of 15.5% for the Potomac Edison Company (Potomac Edison). We find no error in the Commission's decision; therefore, we will affirm its order.

On May 31, 1985, Potomac Edison filed an application for a general increase in rates. In that application, Potomac Edison stated that in the preceding general rate case (the 1981 Rate Case) it had been authorized to earn a rate of return on common equity of 15.5%, and an overall rate of return of 10.7%, all based on a twelve-month test year ending September 30, 1981. In an expedited proceeding which followed the 1981 Rate Case, Potomac Edison's overall rate of return was adjusted to 10.64%. In the instant proceeding, Potomac Edison sought approximately $9.6 million in additional revenues which would produce an overall rate of return of 10.49%.

Francis E. Jeffries testified on behalf of Potomac Edison concerning the appropriate rate of return on common equity. He testified that 16% was fair. He said that the interrelated factors of inflation, business risks, and financial costs are major factors in influencing the investment decision. He said that investment objectives are geared to the level of inflation, with investors attempting to use their common equity investments as a hedge against inflation.

In his testimony, Jeffries described certain market conditions existing between 1980 and 1985. He said that from 1980 to 1983 the cyclical inflation rate declined from 13.5% to 3.2%. However,

he testified that it was too soon to say whether there existed a lasting improvement in inflation since inflation went back up to 4.3% in 1984. He noted further that on new, long-term, double-A utility bonds, the interest rate was about 16% in 1981 and in the first half of 1982. In the second half of 1982, the interest rates on such new bonds declined to the 12% to 12.5% range. A further decline occurred in 1983 when the range changed to 11% to 12.5%. In 1984, the interest rate on new bonds increased to 14%. But by August 1985, there was a decline to 11.5%.

In order to reach a decision as to the appropriate rate of return for Potomac Edison, Jeffries, and all the expert witnesses in the case, analyzed the stock of Allegheny Power Systems (APS), which owns all of Potomac Edison. Jeffries noted that when APS' dividends were adjusted for inflation, from 1973 to 1984 there was a 22% decline in purchasing power despite an 82% nominal increase. Jeffries also adjusted APS' earnings per share for inflation and found a 33% decline in purchasing power despite a 57% nominal increase in earnings per share. He testified further that, with regard to the price per share of APS stock, though there was a nominal increase between 1973 and 1984, when the figure was adjusted for inflation, there was a 42% decline in the price per share. In terms of purchasing power, according to Jeffries, the market value of APS common stock was 1.7 times more in 1973 than in 1984.

Jeffries testified that Potomac Edison faces financial risks because it relies mostly on coal to generate its electricity. He explained that although coal is presently a low risk fuel, federal regulations concerning acid rain could result in significant emission controls.

Jeffries also spoke of risks that are inherent in the ownership of common stock. He said, in that regard, that common stock represents the greatest risk to an investor because there exists no legal requirement for a dividend or repayment. In addition, he explained that common stock is inferior to debt instruments and preferred stocks.

James R. Haltiner testified on behalf of the Commission staff. He recommended a return on common equity in the range of 13.7% to 14.8%. However, he testified that using the discounted cash flow method of analysis adjusted for flotation costs of 5%, he found a composite cost of equity in the range of 14.0% to 15.1%. In Haltiner's view, utilities are less risky than other investments

because they provide a floor for rates of return. He views them as substitutes for bonds but with a growth potential. Using the capital asset pricing model, Haltiner estimated that the cost of equity capital would be in the range of 13.4% to 14.4%.

Reviewing the condition of APS, Haltiner said that it was in good financial health with its rate of return on equity having improved over the preceding five years.

On cross examination, Haltiner admitted that one of his exhibits showed that security analysts expect growth rates of earnings per share and dividends per share ranging from 4.0% to 6.5%. He testified that if the highest figure, 6.5%, was used with his discounted cash flow model, the cost of equity would be 16.1% without adjustment for flotation costs and 16.6% with such adjustment.

Haltiner admitted further that an equity risk premium of 2% to 4% is appropriate for utility stocks. Haltiner explained, however, that this risk premium should be applied to five-year treasury bonds, not double-A utility bonds as suggested by Jeffries. Applying the risk premium to treasury bonds, the top of the range would be 15%.

Haltiner also testified that in recommending his range of return on equity, he did not take into account Potomac Edison's generating unit performance. He admitted not knowing how to take that into account. At that point, the Commission Chairman explained that the Commission attempted to reward efficiency, as shown by generating unit performance, by "adding a little bit to the return on equity." The Chairman asked Haltiner whether such a viewpoint made good economic sense. Haltiner replied: "I think incentive systems make good economic sense in general."

A member of the Commission's staff testified on the issue of generating unit performance. He said that the staff looks for an Equivalent Availability Factor (EAF)* of 75% or more as an attainable level of efficiency. The weighted average of Potomac Edison's generating facilities was 78.1% for selected units during 1984. The witness said, "This situation is highly desirable from both a cost of service and a reliability perspective." The staff made the following recommendation:

---

* The witness defined EAF "as the percentage of time during a specified period that a unit was capable of generating power at its full capacity."

Should the Commission elect to select a range for the return on equity, Staff is of the opinion that the specific value selected for the return on equity for rate-making purposes, give recognition to the performance of the Company's generating units both over time and during the test year (1984).

David Parcell testified on behalf of the Division of Consumer Counsel. He recommended a rate of return on common equity in the range of 13.5% to 14.0%. He testified that interest rates and the inflation rate were much lower today than in 1982 when the Commission authorized a rate of return on common equity of 15.5%. He said the lower rates had had a favorable impact on Potomac Edison and its cost of equity capital. However, he also testified that the discounted cash flow capitalization rate for APS covering 1980 through 1984 was 14.0% to 15.6%. He said that the DCF capitalization rate is frequently referred to as the "Bare Bones Cost of Equity."

In an opinion and order dated April 2, 1986, the Commission set the authorized rate of return on common equity at 15.5%. The Commission noted that Potomac Edison proposed a common equity cost of 16%, the Attorney General recommended a range of 13.5% to 14.0%, and the Commission staff recommended a range of 13.7% to 14.8%. The Commission stated that the various models used in developing a cost of equity were "aids to guide the Commission's expertise in finding a just and reasonable rate."

The Commission referred to the 1981 Rate Case in which it found that the cost of equity ranged from 15% to 15.7% and that a reasonable rate of return to Potomac Edison was 15.5%. It then stated that it had considered the recommendations of the experts as well as the evidence of financial and economic conditions.

The Commission found that Potomac Edison faced risks because it was operating in a changing economic environment and was required to compete with other users of capital offering attractive returns to investors. The Commission noted that since the mid-1970's, the nation's capital markets have been subjected to unprecedented volatility. It pointed out that since that time there have been wide swings in all aspects of economic life from mortgage rates to stock prices. The Commission made specific reference to the volatility of the prime interest rate which peaked at 20% in 1981, fell to 10.5% in 1983, climbed to 13% in 1984, then fell to 9% in 1985. According to the Commission, such rapid and

dramatic swings make business planning difficult. The Commission announced its policy judgment that stability in the cost of equity "is in the interest of utilities, ratepayers and the economic environment of the Commonwealth." The Commission pointed out that when interest rates soared, it did not allow "exorbitant authorized returns which would have exacerbated the situation." The Commission said further that, by the same token, now that interest rates have plummeted, the Commission's response "should not be to cut authorized equity returns drastically, but to once again gradually move in the direction of the trend." The Commission said its goal is "a fair and stable environment which will allow Virginia's utilities to better plan for the future and continue to provide economical, reliable service." The Commission then found that the reasonable range for the cost of equity had declined slightly from the preceding case from a range of 15% to 15.75% to a range of 14.50% to 15.50%. The Commission stated further that because of Potomac Edison's high level of efficiency, for which the Commission had a policy of rewarding by granting the upper end of the range, it set the authorized return on equity at 15.5% and the overall rate of return at 10.33%.

The Attorney General makes three assignments of error:

1. That the 15.5% rate of return on common equity and the 10.33% overall rate of return are unjust and unreasonable in violation of Code §§ 56-235 and 56-235.2.
2. That the 15.5% rate of return on common equity and the 10.33% overall rate of return are erroneous, arbitrary and capricious and unsupported by the evidence of record.
3. That the Commission failed to make proper findings of fact based on the evidence of record to support its determination of a reasonable return on common equity and an overall rate of return for Potomac Edison making its finding unlawful.

The legal principles that apply to the review of a case of this kind have often been stated. Recently, in *Old Dominion Inc.* v. *Corp. Comm.*, 228 Va. 528, 532, 323 S.E.2d 123, 125 (1984), we repeated those principles:

The Commission is an expert tribunal which exercises a legislative function in fixing rates, under powers delegated to it

by the General Assembly. That delegation includes a reasonable amount of discretion. *Central Tel. Co. of Va.* v. *Corp. Comm.*, 219 Va. 863, 874, 252 S.E.2d 575, 581 (1979). It is the duty of the Commission to set rates which are reasonable and fair both to the public and to the utility. A major component in the ratemaking process is the decision as to a reasonable return on equity — a return which will afford the utility a reasonable opportunity to earn a fair return on its investment. *Norfolk* v. *Chesapeake, etc., Tel. Co.*, 192 Va. 292, 312, 64 S.E.2d 772, 782 (1951). The Commission's decision as to a fair and reasonable return on equity is entitled to the same strong presumption of correctness as are other legislative decisions. *Commonwealth* v. *Portsmouth*, 213 Va. 239, 241, 191 S.E.2d 220, 222 (1972). The decision will not be set aside as unfair or unjust unless there appears a clear abuse of legislative discretion. *Appalachian Pow. Co.* v. *Commonwealth*, 216 Va. 617, 626, 221 S.E.2d 872, 878 (1976); *Commonwealth* v. *VEPCO*, 211 Va. 758, 767, 180 S.E.2d 675, 683-84 (1971); *Board of Supervisors* v. *VEPCO*, 196 Va. 1102, 1109-10, 87 S.E.2d 139, 144 (1955).

In *Central Tel. Co. of Va.*, referred to in the foregoing quotation, we also pointed out that "[t]here is no single scientific correct rate of return, and the rate the Commission fixes may not be changed or set aside as confiscatory or unreasonable unless it clearly evinces an abuse of legislative discretion." 219 Va. at 874, 252 S.E.2d at 581.

Applying the principles set forth above to the facts of this case, we must affirm. Here, the rate of return was within the range recommended by the experts. Moreover, the Commission recited the factors and policy considerations that led to its decision as to the appropriate rate of return on common equity and, in turn, the overall rate of return. On this record, we can find no "clear abuse of legislative discretion" on the part of the Commission.

Nor do we think the Commission's decision should be overturned on the ground that it did not make proper findings of fact on the evidence of record. A similar argument was advanced in *Appalachian Pow. Co.* v. *Commonwealth*, 216 Va. 617, 221 S.E.2d 872 (1976), a case in which the utility complained that the rate of return on equity set by the Commission was too low. There, we said that even though the Commission's opinion was

nonspecific, inadequately documented, and lacking in the Commission's usual detail and quality, we were nevertheless able "to ascertain . . . the evidentiary basis for the rate of return allowed by the majority." *Id.* at 625, 221 S.E.2d at 878.

In the instant appeal, the Attorney General complains that the majority made no specific findings about the financial condition of the company since the 1981 Rate Case. However, no one disputed that the company's financial condition was improved and the record shows that the Commission was aware of this improvement because the Commission stated that it had considered all the evidence and because the Commission lowered the range from the 1982 range of 15.0% to 15.75% to a new range of 14.50% to 15.5%. Nevertheless, for other reasons, including stability and rewarding efficiency, the Commission settled upon the 15.5% authorized rate of return. Here, as in *Appalachian,* we can determine the evidentiary basis relied on by the Commission; therefore, we reject the contention that the Commission failed to make proper findings of fact.

For all the foregoing reasons, we will affirm the Commission's order.

*Affirmed.*