PRESENT: Hassell, C.J., Keenan, Koontz, Kinser, Lemons, and Millette, JJ., and Russell, S.J.

THE POTOMAC EDISON COMPANY,
D/B/A ALLEGHENY POWER

v.   Record No. 080727                    OPINION BY
                                   JUSTICE BARBARA MILANO KEENAN
                                          October 31, 2008

STATE CORPORATION COMMISSION, ET AL.


FROM THE STATE CORPORATION COMMISSION

In this appeal, we consider whether the State Corporation Commission (the Commission) erred in setting an electric retail rate in an amount less than the rate requested by the Potomac Edison Company, doing business as Allegheny Power (AP), which rate AP had sought for the purpose of recovering certain purchased power costs under Code § 56-582(B)(i). We focus our inquiry on the question whether in computing AP's rate relief, the Commission properly interpreted language in a previous order that incorporated an agreement between AP and the Commission Staff (the Staff).

I. Historical Context

In 1999, the General Assembly passed the Virginia Electric Utility Restructuring Act (the Act), former Code §§ 56-576 et seq., in order to deregulate the electricity market and create a new competitive market for the purchase and sale of

electricity.[1]  The Act provided that during the transition to a competitive market, the Commission would establish capped rates for customers purchasing electricity from incumbent electric utilities,[2] and that the capped rates would be effective from January 1, 2001 through July 1, 2007 (the capped rate period). Former Code § 56-582(A)(Supp. 1999).

The Act also provided that the Commission would "direct the functional separation of generation, retail transmission and distribution of all incumbent electric utilities."  Former Code § 56-590(B)(1)(Supp. 1999).  While the Commission was not permitted under the Act to require an incumbent electric utility to divest itself of generation or transmission assets in order to achieve "functional separation," each incumbent utility was required to submit a plan for "functional separation of generation, transmission, and distribution" by January 2001.  Former Code § 56-590(B)(2)(Supp. 1999).  The Act permitted the Commission to impose conditions on its approval of any incumbent electric utility's plan for functional separation, including a requirement that the incumbent electric

---

[1] In 2007, the General Assembly passed legislation ending its initiative to create a competitive market in Virginia for electric generation supply.  2007 Acts chs. 888, 933.

[2] " 'Incumbent electric utility' means each electric utility in the Commonwealth that, prior to July 1, 1999, supplied electric energy to retail customers located in an exclusive service territory established by the Commission." Former Code § 56-576 (Supp. 1999).

2

utility's generating assets or their equivalent be made available for electric service during the capped rate period. Former Code § 56-590(B)(3)(Supp. 1999).

In 2000, AP asked the Commission to approve AP's plan to separate its generation facilities from its transmission and distribution facilities by transferring its generating facilities to an affiliate, Allegheny Energy Supply Company, LLC (GENCO).  The Commission approved AP's requested generation divestiture plan by order (the divestiture order).  In re Potomac Edison Co., Case No. PUE-2000-00280 (July 11, 2000).

In the divestiture order, the Commission adopted and incorporated a memorandum of understanding (MOU) that AP had reached with the Staff after "extensive negotiations."  Id. The MOU contained certain representations that AP made to comply with the Act in order to ensure "that adequate and reliable service at just and reasonable rates will continue to be provided to Virginia retail customers" during the transition to a deregulated market.  Id.

The divestiture order noted that AP's "core pledge" in the MOU was AP's commitment after divestiture of its generation assets to contract for generation sufficient to meet its default service[3] demand, and that the pricing of such service

_____

[3] Default service means "service made available . . . to retail customers who (i) do not affirmatively select a

3

would be based on a frozen unbundled generation rate during the capped rate period.  Id.  The MOU also contained the following relevant representations in its Paragraph 4:

> For ratemaking purposes, including any request to increase frozen rates due to financial distress, Virginia default service load will first be deemed to be served from a finite portion of the GENCO's generation facilities, in an amount up to 367 MW, which equals the Virginia load now reflected in the allocation in AP's generation costs to Virginia retail customers.  During the rate cap period, pricing of the 367 MW will be based on the Virginia unbundled frozen generation rate.  After the rate cap period, pricing of the 367 MW will be based on the then current generation costs of the portion of the existing system dedicated to serve retail Virginia load.  (Emphasis added.)

Shortly after the Commission entered the divestiture order, AP entered into a contract with GENCO to purchase the power AP needed to meet all its default service obligations in Virginia during the capped rate period.  AP's contract with GENCO stated an expiration date of June 30, 2007, the day before the end of the capped rate period.

In 2004, however, the General Assembly amended Code § 56-582, extending the capped rate period from 2007 until 2010.[4] 2004 Acts ch. 827.  When AP's contract with GENCO expired, AP

---

supplier, (ii) are unable to obtain service from an alternative supplier, or (iii) have contracted with an alternative supplier who fails to perform."  Former Code § 56-585(A)(Supp. 1999).

[4] In 2007, the General Assembly amended Code § 56-582(F) again to end the capped rate period in December 2008.  2007 Acts chs. 888, 933.

4

began meeting its default service obligations by procuring power from the competitive wholesale market.

In addition to extending the capped rate period, the 2004 amendments to Code § 56-582(B)(i) permitted a utility that had divested its generation facilities to seek adjustments to capped rates in connection with the utility's "purchased power costs."[5]  2004 Acts ch. 827.  According to this provision, however, an adjustment to capped rates would be subject to the terms and conditions of any Commission order approving the divestiture of generation assets.  Code § 56-582(B)(i).

In April 2007, AP filed an application with the Commission to adjust capped rates, arguing that the Commission was required by the 2004 amendments to Code § 56-582 to allow AP to recover all its purchased power costs beginning July 1, 2007. The Commission determined that it was not mandated, as a matter of law, to adjust capped rates and was not required at that time to act in its legislative capacity because AP had not requested that the Commission so act to adjust rates.  This Court affirmed the Commission's decision in an unpublished order.  Potomac Edison Co. v. State Corp. Comm'n, Record No. 071566 (April 11, 2008).

---

[5] Code § 56-582 also permits the Commission to adjust capped rates during the capped rate period in connection with several other situations, including, in subsection (iii) any financial distress of the utility beyond its control.

5

## II.  Facts & Proceedings

In September 2007, AP filed an application with the Commission requesting a rate adjustment to permit recovery of a portion of its projected purchased power costs as permitted by Code § 56-582(B)(i).  In the application, AP requested a rate increase of about 26% beginning in October 2007, to recover a portion of the purchased power expenses that AP would incur to serve its Virginia default customers as of July 1, 2007.  AP stated that this rate increase would permit the company to recover $44.9 million,[6] which represented the wholesale costs for purchasing power for the "load above 367" megawatts (MW) as referenced in Paragraph 4 of the MOU.

In response to AP's application, the Commission issued an order providing for notice and a hearing.  Comments were filed by the Division of Consumer Counsel of the Office of the Attorney General (Consumer Counsel) and by 18 local businesses affiliated with the Frederick County Industrial Development Authority.

The evidence presented to the Commission by AP and the Staff included opposing interpretations of the language in Paragraph 4 of the MOU relating to the phrase "up to 367 MW." AP presented testimony and exhibits to the Commission

---

[6] In its application, AP originally sought to recover $44.9 million but ultimately modified that requested amount to $37.2 million.

6

supporting its requested amount of purchased power costs for the "load above 367 MW." AP's evidence showed that prior to divestiture, its generation facilities allocated to Virginia produced generation output at a capacity of only about 66%, because the units were subject to weather-related outages, scheduled and unscheduled maintenance requirements, and other disruptions. In addition, AP presented evidence that in 2006, these same generation facilities were generating power at about the same 66% capacity. AP maintained that based on this operational capacity, if AP had continued to own the divested generation facilities, AP would have been required to purchase wholesale power to serve Virginia customers at loads above an average of about 242 MW, or 66% of the 367 MW referenced in the MOU.

The Staff filed comments with the Commission stating that AP's calculation, assuming a 66% capacity factor, would allow AP to recover purchased power costs for the load above 242 MW. Thomas E. Lamm, a member of the Staff, testified that the Staff concluded that the language in the MOU referring to 367 MW "has nothing to do with the actual operations of any unit or set of units." Lamm stated that the reference to 367 MW in the MOU is "a negotiated ratemaking construct and refers to the level of default service load or generation output serving such load."

Lamm further testified that the MOU did not identify specific units from which the generation service must be provided and did not suggest any factor for operational performance reduction. A portion of Lamm's testimony was corroborated by the testimony of Mark A. Mader, Director of Rates for Allegheny Energy Service Corp., who agreed that the MOU did not obligate AP to contract with GENCO to meet AP's default service requirements.

Lamm also testified that in 2000, the demand from AP's Virginia customers exceeded 367 MW and that the "embedded generation costs included in the rates charged to retail customers were much greater than the capacity and energy costs associated solely with the 367 megawatts." The Staff recommended to the Commission that if AP were permitted to recover purchased power costs for the load above 367 MW, without an adjustment in favor of AP due to the 66% capacity factor, AP could recover about $9.48 million, which represented an average rate increase of about 5.6%.

In its final order, the Commission first determined that the 2004 amendments to Code § 56-582(B) authorized AP to seek recovery in accordance with the MOU of increased purchased power costs on and after July 1, 2007. AP does not challenge this ruling on appeal.

8

The Commission also determined in its final order the amount of purchased power costs that AP was permitted to recover under Paragraph 4 of the MOU. The Commission concluded that the Staff's calculations correctly implemented the ratemaking requirements in the MOU, which established a pricing mechanism for load above 367 MW, not for load incorporating an adjustment for a capacity factor. The Commission granted AP a rate increase that resulted in AP's recovery of about $9.48 million in purchased power costs.

AP filed an appeal from the Commission's decision with this Court under Rule 5:21(c). AP named as appellees the Commission, Consumer Counsel, and the Frederick County Industrial Development Authority.[7]

### III. Analysis

AP asserts that the retail rate set by the Commission was inconsistent with the language contained in the MOU and prevented AP from recovering all its purchased power costs that exceeded the load stated in the MOU. AP argues that the Commission's decision constitutes a mistake of law because it is inconsistent with the provisions in Code § 56-590(B)(3)(i) that refer to "generation assets or . . . their equivalent."

---

[7] The Frederick County Industrial Development Authority did not file a brief in this appeal.

According to AP, this statutory language refers to specific generation facilities and their capabilities.

AP also contends that the Commission's decision is contrary to the purpose of the MOU, which was designed to treat AP as if it had not divested its generation assets in 2000. AP argues that before the divestiture, AP's generation facilities produced an average of 66% of 367 MW and that, therefore, AP should have been permitted to recover the costs AP incurred to purchase power above the amount of 242 MW that would have been generated.

AP further argues that the MOU refers to the specific generation facilities AP owned before the divestiture, and that the term "367 MW" reflects the amount of total power generated by the divested facilities that was allocated to Virginia default service customers. AP also maintains that the phrase "up to 367 MW" in the MOU reflects the fact that the divested facilities do not produce a constant output of 367 MW.

In response, the Commission and Consumer Counsel (collectively, Consumer Counsel) contend that the evidence supports the Commission's decision, which was rendered within the scope of the Commission's expertise. According to Consumer Counsel, the capped rates established in 2000 included AP's costs to provide its default customers with all the electrical generation they demanded, up to and in excess of 367 MW.

Consumer Counsel contends that the MOU ensured that at least 367 MW of the total load provided by AP to its default customers would continue at cost-based rates after the capped rate period expired.

Consumer Counsel also asserts that the MOU does not contain any language suggesting an adjustment for actual generating unit output. Consumer Counsel argues that the term "367 MW" in the MOU refers to "load," which is the demand for electricity, and does not refer to "supply," which is the amount of generated electricity. Finally, Consumer Counsel contends that the language "up to 367 MW" recognizes the fact that AP's default service load would be reduced if its customers chose to receive service from one of AP's competitors.

In considering the parties' arguments, we initially observe that the Constitution of Virginia gives the Commission broad powers in the control and regulation of public service corporations, and charges the Commission with administrative, judicial, and legislative functions. See Va. Const. art. IX; Northern Virginia Elec. Coop. v. VEPCO, 265 Va. 363, 368, 576 S.E.2d 741, 743 (2003); Board of Supervisors v. Appalachian Power Co., 216 Va. 93, 105, 215 S.E.2d 918, 927 (1975). In recognition of these constitutional duties, we have held that the Commission is an expert tribunal established by law and

11

informed by experience.  Northern Virginia Elec. Coop., 265 Va. at 368, 576 S.E.2d at 743; Lawyers Title Ins. Corp. v. Norwest Corp., 254 Va. 388, 390-91, 493 S.E.2d 114, 115 (1997); Swiss Re Life Co. Am. v. Gross, 253 Va. 139, 144, 479 S.E.2d 857, 860 (1997).

When we review a Commission decision in which the Commission has applied its expertise, we begin by according the decision a presumption of correctness.  Northern Virginia Elec. Coop., 265 Va. at 368, 576 S.E.2d at 743; Farmers & Merchants National Bank v. Commonwealth, 213 Va. 401, 404, 192 S.E.2d 744, 747 (1972); see Tanner v. State Corp. Comm'n, 265 Va. 148, 152, 574 S.E.2d 525, 527 (2003); Gross, 253 Va. at 144, 479 S.E.2d at 860; Lawyers Title Ins. Corp., 254 Va. at 390, 493 S.E.2d at 115.  Depending on the nature of the particular Commission decision, however, our standard of review will vary.

When a Commission decision is based on the application of principles of law, we will affirm the decision if the Commission has correctly applied the controlling legal principles.  See Northern Virginia Elec. Coop., 265 Va. at 368, 576 S.E.2d at 743-44; Tanner, 265 Va. at 152, 574 S.E.2d at 527; Gross, 253 Va. at 144, 479 S.E.2d at 860; Lawyers Title Ins. Corp., 254 Va. at 390-91, 493 S.E.2d at 115.  However, we are required to reverse a Commission decision if it is based on a mistake of law.  Northern Virginia Elec. Coop., 265 Va. at

12

368, 576 S.E.2d at 743-44; Tanner, 265 Va. at 152, 574 S.E.2d at 527; First Virginia Bank v. Commonwealth, 213 Va. 349, 351, 193 S.E.2d 4, 5 (1972).

In fixing utility rates under the powers delegated by the General Assembly, the Commission exercises a legislative function. Hopewell Cogeneration Ltd. P'ship v. State Corp. Comm'n, 249 Va. 107, 115, 453 S.E.2d 277, 281-82 (1995); Commonwealth v. Potomac Edison Co., 233 Va. 165, 170-71, 353 S.E.2d 785, 788 (1987); Old Dominion Power Co., Inc. v. State Corp. Comm'n, 228 Va. 528, 532, 323 S.E.2d 123, 125 (1984); Central Tel. Co. v. State Corp. Comm'n, 219 Va. 863, 874, 252 S.E.2d 575, 581 (1979); see Va. Const. art. IX, § 2. When the Commission has acted in this legislative capacity and has not based its decision on the resolution of an issue of law, we will set aside the Commission's decision only if the Commission clearly has abused its legislative discretion. Potomac Edison Co., 233 Va. at 171, 353 S.E.2d at 788-89; Old Dominion Power Co., Inc., 228 Va. at 532, 323 S.E.2d at 125; Central Tel. Co., 219 Va. at 874, 252 S.E.2d at 581-82.

Based on these distinctions, we first must decide whether the decision before us was based on the application of legal principles or on purely an exercise of the Commission's legislative authority. In making this determination, we

13

consider AP's application, the language of the MOU, and the substance of the Commission's decision.

In its application, AP requested that the Commission exercise its authority "to adjust [AP's] capped rates, to approve this Application, and to permit purchased power recovery at $0.01450 per kWh."  This request for relief illustrates that AP was asking the Commission to exercise its ratemaking authority, a legislative function delegated to the Commission by the General Assembly.  See Hopewell Cogeneration Ltd. P'ship, 249 Va. at 115, 453 S.E.2d at 281-82; Potomac Edison Co., 233 Va. at 170-71, 353 S.E.2d at 788; Old Dominion Power Co., Inc., 228 Va. at 532, 323 S.E.2d at 125.

The language of Paragraph 4 of the MOU stated that the MOU's terms were applicable "[f]or ratemaking purposes." Viewed in this context, the Commission's interpretation of Paragraph 4, in effect, determined the allowable rate adjustment under the divestiture order for amounts exceeding 367 MW.

The fact that the Commission was required to interpret the language of the MOU did not transform the issue before the Commission from a legislative matter to a question of law.  The disputed language in the MOU was not subject to resolution under contract principles, but was part of the divestiture order to be interpreted by the Commission within its capacity

14

as an expert tribunal.  Moreover, the terms of the MOU provided the actual framework for the Commission's adjustment of the capped rates, and the Commission was not required to resolve any disputed statutory language or other issue of law in making this rate adjustment.  Based on these considerations, we hold that the Commission's decision was purely an exercise of its legislative ratemaking authority and was not based on any disputed issue of law.[8]

Because the Commission exercised its legislative authority in the present case, its decision is subject to our review under an abuse of discretion standard.  See Potomac Edison Co., 233 Va. at 171, 353 S.E.2d at 788-89; Old Dominion Power Co., Inc., 228 Va. at 532, 323 S.E.2d at 125; Central Tel. Co., 219 Va. at 874, 252 S.E.2d at 581-82.  We hold that the present record, as set forth above, provides ample support for the conclusion that the Commission did not abuse its discretion.

Included in this record is Thomas Lamm's testimony that the reference in the MOU to 367 MW was unrelated to the actual operation of any equipment or generation unit, but was a

---

[8] AP argues, nevertheless, that the Commission's decision is inconsistent with Code § 56-590(B)(3)(i), which provides for conditions that the Commission is authorized to impose as part of its approval of a divestiture order.  We do not consider this argument, however, because AP's assignments of error do not address this issue, but instead challenge whether the rate set by the Commission was contrary to the terms of the MOU and was based on an improper "methodology."  See Rule 5:21(i).

15

"negotiated ratemaking construct" addressing the "level of default service load or generation output serving such load." In addition, and of particular note, the Commission's decision is supported by the absence of any language in the MOU stating that the 367 MW should be reduced by a capacity factor. Thus, we hold that the Commission did not abuse its legislative ratemaking authority in determining that the MOU established a pricing mechanism for load above 367 MW, not load incorporating an adjustment for a capacity factor, and that, therefore, AP should be permitted to recover about $9.48 million in purchased power costs.

We also find no merit in AP's second assignment of error that the Commission improperly relied on the Staff's methodology in determining AP's requested rate. The Commission's apparent acceptance of Lamm's calculations contained in Exhibit 14, which was submitted after the hearing, was a matter clearly within the Commission's discretion. Additionally, AP's failure to challenge these calculations, apart from criticizing the Staff's failure to account for the operational capacity factor of 367 MW, shows that AP was merely restating the same argument regarding a capacity factor that the Commission rejected in its interpretation of the MOU.

Finally, we do not consider the merits of AP's alternative argument that the Commission failed to set a just and

16

reasonable rate, and that the Commission should have inquired into AP's financial condition before setting the retail rate in this case.  AP has not assigned error to the "reasonableness" of the adjusted rate fixed by the Commission, and AP did not ask the Commission to consider its financial condition as a component of its ratemaking decision.

For these reasons, we will affirm the Commission's order.

<u>Affirmed.</u>