PRESENT: Lemons, C.J., Mims, McClanahan, Powell, Kelsey, and McCullough, JJ., and Lacy, S.J.

BOARD OF SUPERVISORS OF
LOUDOUN COUNTY

v. Record No. 151976

STATE CORPORATION COMMISSION, ET AL.

OPINION BY
JUSTICE ELIZABETH A. McCLANAHAN
September 8, 2016

DAVID I. RAMADAN

v. Record No. 160002

STATE CORPORATION COMMISSION, ET AL.

FROM THE STATE CORPORATION COMMISSION

These consolidated appeals of right by the Board of Supervisors of Loudoun County

("Board") and David I. Ramadan (collectively, "Appellants") arise from a Code § 56-542(D)

investigation by the State Corporation Commission ("Commission") of the tolls charged by Toll

Road Investors Partnership II, L.P. ("TRIP II") for the Dulles Greenway ("Greenway"), a

privately owned toll road located primarily in Loudoun County. Following the investigation,

including an extensive evidentiary hearing, the Commission decided against reducing the tolls

under the authority of Code § 56-542(D), notwithstanding Appellants' requests for their

reduction. We affirm the Commission's decision.

I. BACKGROUND

Under the Virginia Highway Corporation Act of 1988, Code § 56-535 *et seq.* (the "Act"),

the General Assembly authorized the construction and operation of private toll roads in Virginia.

*See* 1988 Acts, ch. 649. The Act delegates certain regulatory authority for these roads to the

Commission, including approval and revision of the tolls. Code § 56-542. Specifically, the Act

provides in subsection (D) of Code § 56-542 that the Commission "shall have the duty and

authority to approve or revise the toll rates charged by the operator." In exercising this authority, the Commission is required to approve the initial rates "if they appear reasonable to the user in relation to the benefit obtained, not likely to materially discourage use of the roadway and provide the operator no more than a reasonable rate of return as determined by the Commission." *Id.* Utilizing these same criteria, subsection (D) then provides: "Thereafter, the Commission, upon application, complaint or its own initiative, and after investigation, *may* order substituted for any toll being charged by the operator, a toll which is set at a level [1] which is reasonable to the user in relation to the benefit obtained and [2] which will not materially discourage use of the roadway by the public and [3] which will provide the operator no more than a reasonable return as determined by the Commission." (Emphasis and numbers added.)

Pursuant to this statutory and regulatory scheme, TRIP II's predecessor obtained a certificate of authority from the Commission to construct, own, and operate the Greenway, consisting of a fourteen mile limited-access toll road from Leesburg to the then-existing Dulles Toll Road. TRIP II then acquired and completed the Greenway, which opened in 1995—becoming Virginia's first and only privately owned toll road to open in nearly a century and a half.[1] The initial and subsequent "substituted" toll rates approved by the Commission for the Greenway under Code § 56-542(D) incorporated incremental rate increases for future years. The

---

[1] The Act grants the Commission the power to regulate the Greenway as a public service corporation even though it is not such an entity. Code § 56-542(B). The Greenway's developers did not have eminent domain authority in acquiring the land for its construction. Code § 56-541. Unlike most public service corporations that the Commission regulates, the Greenway is not a monopoly with an exclusive service territory as it is subject to competition from multiple free alternative roadways. Further, the Greenway was built entirely with private equity and debt, and TRIP II as its operator is responsible for all of its operating costs.

last such action was in 2007 when the Commission approved incremental rate increases for the years 2008 through 2012.

Then, in 2008, the General Assembly amended the Act by adding subsection (I) to Code § 56-542, which provides three different ways for annually increasing tolls "[e]ffective January 1, 2013 through January 1, 2020 . . . notwithstanding any other provision of law."  Code § 56-542(I); *see* 2008 Acts, ch. 841.  As relevant to this case, subsection (1) of Code § 56-542(I) requires the Commission to approve toll rate increases requested by the operator based on the greater of the change in the consumer price index ("CPI") plus one percent, the change in gross domestic product, or 2.8 percent.[2]

In November 2012, TRIP II filed its first application requesting an increase in the toll rates for the Greenway under Code § 56-542(I) to become effective in January 2013.  TRIP II made the request under subsection (1) of Code § 56-542(I) based on the increase in the CPI since TRIP II's last increase in the toll rates under Code § 56-542(D) that went into effect in January 2012 (as approved in 2007).

Responding to TRIP II's Code § 56-542(I) application, Ramadan, then a member of the Virginia House of Delegates, sent a letter to the Commission in December 2012 designated "an official complaint" under Code § 56-542(D).  Ramadan therein requested (i) that the Commission investigate the "current toll rates" for the Greenway (i.e., the rates as of 2012) "to ensure that they comply with [Code § 56-542(D)]" and (ii) that TRIP II's "current request for a

---

[2] Subsection (2) of Code § 56-542(I) requires the Commission to approve an operator's request to increase toll rates to cover certain increases in property taxes.  Subsection (3) of Code § 56-542(I) then authorizes the Commission to approve an operator's request for an increase in the toll rates by a greater percentage than provided in subsection (1) based on certain criteria set forth therein, including, in part, the same criteria set forth in Code § 56-542(D).

toll increase [under Code § 56-542(I)] be suspended until this complaint can be addressed and resolved by the [Commission]."

TRIP II filed a response to Ramadan's letter, asserting to the Commission, inter alia, that while it was "certain that any review of the [then current] tolls will have the same result as past reviews by the Commission, [Ramadan's] inquiries under § 56-542(D) of the Code are not germane to the current proceeding under § 56-542(I) of the Code." Under Code § 56-542(I), according to TRIP II, "the Commission 'shall approve' any request to increase tolls that comply with the prescribed statutory percentage increase" and TRIP II's pending application was in compliance with subsection (I). Thus, TRIP II contended, the application was "ripe for approval by the Commission" and "any suspension of the current proceeding on the basis of the issues raised by Delegate Ramadan would be inappropriate."

Agreeing with TRIP II, the Commission, by order entered in January 2013, concluded that subsection (I) of Code § 56-542 did not give it discretion to suspend the proceeding on TRIP II's subsection (I) application for the purported purpose of initiating a subsection (D) investigation. The Commission thus denied Ramadan's request to suspend the proceeding. Shortly thereafter, Ramadan responded with a second letter to the Commission in which he objected to the order; asserted again that "any increase in the current toll structure" on TRIP II's Code § 56-542(I) application would violate Code § 56-542(D); and renewed his request for an "investigation into the current rate structure," advocating "that the current rate be decreased."[3] On the same day it received this letter, the Commission entered a final order approving increases

_____

[3] As explained more fully in Ramadan's letter regarding his specific objection to TRIP II's then pending Code § 56-542(I) application, Ramadan indicated there would be "no dispute" about TRIP II's right to an increase in the toll rates on its application but for the fact, he contended, that the "current" or "underlying toll structure" is in violation of Code § 56-542(D). He accordingly asserted that the application for the toll rate increase "should be denied."

4

in the toll rates charged by TRIP II for the Greenway (effective January 21, 2013) based on the increase in the CPI "[p]ursuant to the requirements" of Code § 56-542(I).  Ramadan did not appeal that order to this Court. [4]

The Commission, however, issued an Order Initiating Investigation ("Initiating Order") several days later in January 2013 in response to Ramadan's two complaint letters.  The Initiating Order began an investigation, pursuant to Code § 56-542(D), of the "current toll rates" charged by TRIP II for the Greenway.  Therein, the Commission asked Ramadan and TRIP II, as the designated parties to the proceeding, along with the Commission's Staff ("Staff"), "to address and define with specificity the standards that the Commission should apply" for each of the three criteria in Code § 56-542(D) and "to explain, based on [an] analysis of the law and the facts, why the current toll rates do or do not meet such criteria."

The Initiating Order also appointed a hearing examiner to conduct the proceedings in this case and to file a report containing findings and recommendations.  During the course of the proceedings, the hearing examiner granted the Board's motion to participate as a respondent in the case. [5]  The Board joined Ramadan in advocating a reduction in the toll rates for the Greenway.

Following extensive public comment, discovery and evidentiary proceedings, the hearing examiner issued her report in January 2014.  Her threshold determination was that the

---

[4] In the three successive years, the Commission, upon TRIP II's Code § 56-542(I) applications, issued orders approving similar increases in the toll rates for the Greenway and none of those orders were appealed to this Court.

[5] Because of the Board's untimely request to participate in the case, the hearing examiner, in granting its motion, limited the Board's participation in the evidentiary hearing to cross-examining witnesses, making an opening statement and closing argument, and filing a pre-hearing legal memorandum.

Greenway's toll rates approved by the Commission in 2007 (establishing increases through 2012) "are not currently subject to adjustment" under subsection (D) of Code § 56-542 because of the enactment of subsection (I) of the statute. Subsection (D), she concluded, was superseded by subsection (I) for the years 2013 to 2020, as set forth in subsection (I). However, the hearing examiner proceeded to evaluate the toll rates under subsection (D), as directed in the Initiating Order, and concluded that Appellants failed to "bear the burden of proving" that the existing rates (i.e., those approved by the Commission with the subsection (I) increase in January 2013) did not comply with subsection (D) as they claimed, with one limited exception.[6]

Upon its review of the record and the hearing examiner's detailed report and recommendations, the Commission issued an Order Concluding Investigation ("Concluding Order") in which it decided not to substitute new toll rates for the Greenway under the authority of Code § 56-542(D). In doing so, the Commission considered the evidence, including expert testimony presented by Ramadan and TRIP II, as well as Staff, and their respective arguments as to the application of the three criteria set forth in subsection (D). Unlike the hearing examiner, however, the Commission analyzed the record without "plac[ing] a threshold burden [of proof] on any participant." The Commission also opted "not to define further" the three criteria under subsection (D) in conducting its analysis.

With regard to subsection (I) of Code § 56-542, the Commission concluded that, since presently it would not be substituting new toll rates under subsection (D) to the extent subsection (D) was controlling, it need not reach the question of whether subsection (I) "prohibits the

---

[6] The exception was a limited class of tolls consisting of those charged for multi-axle trucks during off-peak periods for which the hearing officer recommended a modest reduction.

6

Commission from substituting tolls under [subsection (D)] until after January 1, 2020."[7] Commissioner Christie, however, while concurring with the majority's decision to conclude the investigation without changing the toll rates, wrote separately on the basis that he would decide the case under subsection (I). On his reading of it, "[s]ubsection (I) does not authorize the Commission to order toll changes on the Greenway between the years 2013 and 2020, except as prescribed by [s]ubsection (I)"—this being "the General Assembly's chosen policy regarding any toll changes that are to take place" during that period. Accordingly, subsection (D), in Commissioner Christie's view, is inapplicable as a matter of law in this case.

These consolidated appeals of right followed.

## II. ANALYSIS

### A. Standard of Review

We are guided in our review of the Commission's decision by well settled principles. "'The Commission is a specialized body with broad discretion in regulating public utilities.'" *Virginia Elec. & Power Co. v. State Corp. Comm'n*, 284 Va. 726, 741, 735 S.E.2d 684, 691 (2012) (quoting *Level 3 Commc'ns of Va. v. State Corp. Comm'n*, 268 Va. 471, 474, 604 S.E.2d 71, 72 (2004)). As the Commission applied its expertise in deciding this case, the decision is "'entitled to the respect due judgments of a tribunal informed by experience,'" *BASF Corp. v. State Corp. Comm'n*, 289 Va. 375, 391 770 S.E.2d 458, 467 (2015) (quoting *Appalachian Voices v. State Corp. Comm'n*, 277 Va. 509, 516, 675 S.E.2d 458, 461 (2009)), and thus it comes to us with "'a presumption of correctness.'" *Id*. (quoting *Office of Attorney Gen. v. State Corp. Comm'n*, 288 Va. 183, 191, 762 S.E.2d 774, 778 (2014)). Accordingly, "'[w]e will not substitute our judgment in matters within the province of the Commission and will not overrule

---

[7] The Commission still reiterated that Code § 56-542(I) "does not provide [it] with the discretion to deny toll rate increases that comport with the statutory formula."

the Commission's findings of fact unless they are contrary to the evidence or without evidentiary support.'" *Id.* (quoting *Level 3 Commc'ns of Va., Inc.*, 268 Va. at 474, 604 S.E.2d at 72). Furthermore, while we review issues of law de novo, "'we will not disturb the Commission's analysis when it is based upon the application of correct principles of law.'" *Id.* (quoting *Appalachian Voices*, 277 Va. at 516, 675 S.E.2d at 461).

B. Commission's Construction and Application of Code § 56-542(D)

In challenging the Commission's Concluding Order, Appellants assert that this case is governed by subsection (D) of Code § 56-542 and that the Commission erred in its construction and application of this provision. TRIP II, on the other hand, argues that subsection (I) controls, negating a subsection (D) investigation and prohibiting any reduction in tolls from 2013 to 2020. In the alternative, TRIP II and Staff contend that, if subsection (D) does control, the Commission did not abuse its broad statutory discretion in deciding to conclude the investigation without substituting new tolls for the Greenway. We need not reach the question of whether subsection (I) prohibits the Commission from substituting new tolls under subsection (D) until after January 1, 2020, and will assume without deciding that subsection (D) is controlling for purposes of this case.[8] We conclude the Commission did not abuse its discretion in reaching its decision under a subsection (D) analysis.

_____

[8] *See, e.g.*, *McGhee v. Commonwealth*, 280 Va. 620, 624, 701 S.E.2d 58, 60 (2010) ("[a]ssuming without deciding that Code § 18.2-388 requires physical impairment"); *William E.S. Flory Small Bus. Dev. Ctr. v. Commonwealth*, 261 Va. 230, 234 n. 1, 541 S.E.2d 915, 917 n. 1 (2001) ("assum[ing] without deciding that the Procurement Act applies to oral contracts"); *Mahoney v. NationsBank of Virginia, N.A.*, 249 Va. 216, 220 n. 2, 455 S.E.2d 5, 7 n. 2 (1995) ("assum[ing], without deciding, that the UCC governs"); *Volvo White Truck Corp. v. Vineyard*, 239 Va. 87, 8 n. 1, 387 S.E.2d 763, 764 n. 1 (1990) ("assum[ing], without deciding, that Virginia law governs"). This approach is consistent with our effort to decide cases on the "'best and narrowest grounds available.'" *Hampton Rds. Bankshares, Inc. v. Harvard*, 291 Va. 42, 52, 781

Appellants argue that the Commission's "principal error" was in construing Code § 56-542(D) "to require that it reject any challenge to existing toll rates so long as the existing rates continue to satisfy [subsection (D)'s] minimum criteria," which the Commission found to be the case with the Greenway's existing rates.[9] In so misconstruing subsection (D), Appellants contend, the Commission "abandon[ed]" and "ignore[d]" the objective of its investigation, which was "to determine whether new rates ought to be substituted" for the Greenway under the authority of subsection (D)—not whether new rates were "required to be substituted." We disagree with Appellants' assessment of the Commission's interpretation and application of subsection (D) in this case.

As with other ratemaking procedures for public utilities, the General Assembly has delegated broad discretion to the Commission for the performance of the legislative function of setting toll rates under Code § 56-542(D). *See Virginia Elec. & Power Co. v. State Corp. Comm'n*, 284 Va. at 741, 735 S.E.2d at 691 ("[W]hen the Commission is conducting a ratemaking procedure, it is exercising a legislative function delegated to it by the General Assembly." (citing *Potomac Edison Co. v. State Corp. Comm'n*, 276 Va. 577, 587, 667 S.E.2d 772, 777 (2008)). Subsection (D) does not set forth any circumstances under which the Commission is required to order the "substitut[ion]" of new toll rates. Code § 56-542(D). Rather, subsection (D) provides that the Commission "*may*" do so "after investigation"—limited solely by the condition that any new toll rates that "*may*" be set are to comply with the provision's three criteria: that they will be "reasonable to the user in relation to the benefit

---

S.E.2d 172, 177 (2016) (quoting *Alexandria Redevelopment & Hous. Auth. v. Walker*, 290 Va. 150, 156, 772 S.E.2d 297, 300 (2015)).

[9] As with this argument, nearly all of Appellants' arguments in their respective opening briefs are identical, word for word.

obtained," "will not materially discourage use of the roadway by the public," and "will provide the operator no more than a reasonable return." *Id.* (emphases added). As we recently explained, in construing statutes this Court "will apply the ordinary meaning of the word 'may,'" which is "'permission, importing discretion'" where, as here, no "contrary legislative intention plainly appears." *Sauder v. Ferguson*, 289 Va. 449, 457, 771 S.E.2d 664, 668-669 (2015) (quoting *Masters v. Hart*, 189 Va. 969, 979, 55 S.E.2d 205, 210 (1949); *see Small v. Federal Nat'l Mortg. Ass'n*, 286 Va. 119, 131, 747 S.E.2d 817, 824 (2013) ("'[T]he word "may" is prima facie permissive, importing discretion.'" (quoting *Harper v. Virginia Dep't of Taxation*, 250 Va. 184, 194, 462 S.E.2d 892, 898 (1995)); *Advanced Towing Co. v. Fairfax Cnty. Bd. of Supervisors*, 280 Va. 187, 193, 694 S.E.2d 621, 625 (2010) (same).

Consistent with this statutory authority, the Commission initiated the investigation of the Greenway's existing toll rates in response to Ramadan's complaint through which he sought their reduction. The Commission procured and "fully" considered "all of the evidence" presented on this issue by Ramadan, TRIP II and Staff, as explained in the Concluding Order.[10] Upon doing so, the Commission found that Ramadan's evidence offered in support of reducing the existing toll rates *failed to meet the subsection (D) criteria* whereas TRIP II's and Staff's evidence showed that the existing rates *did in fact continue to meet the criteria*. (We address Appellants' specific challenges to the Commission's factual findings in Part II.C., *infra*.) This is the context in which the Commission concluded that Appellants' proposed lower toll rates "are

---

[10] We note that even in the absence of this representation by the Commission, pursuant to our governing standard of review, the Commission's decision comes to us with a presumption that it considered all of the evidence of record. *See State ex rel. Lovell v. Industrial Comm'n of Ohio*, 658 N.E.2d 284, 287 (Ohio 1996) ("[T]he presumption of regularity that attaches to commission proceedings gives rise to a second presumption—that the commission indeed considered all the evidence before it." (internal citation omitted)).

not required to be substituted for the existing [rates] as a result of the instant investigation." This conclusion on the present record simply does not support Appellants' contention that the Commission erred as a matter of law in its construction and application of subsection (D). Specifically, there is no validity to Appellants' argument that the Commission erroneously determined that it was legally prohibited from substituting new toll rates if existing rates minimally satisfy subsection (D). The Commission made no such determination. The record instead makes clear that in conducting the investigation the Commission was fully aware of its broad discretionary authority under subsection (D) to "approve or revise" the toll rates for the Greenway. Code § 56-542(D). Moreover, it is self-evident that the Commission would ultimately decide to retain the existing toll rates given its findings that the existing toll rates met the subsection (D) criteria while the proposed lower toll rates did not. The Commission, therefore, did not err in its construction and application of subsection (D) as Appellants claim.[11]

---

[11] Appellants also contend the Commission erred in its construction and application of subsection (D) by not defining the provision's three criteria beyond what is set forth in the text of the provision. In making this claim, Appellants point to the Commission's instruction to the parties in the Initiating Order "to address and define with specificity the standards that the Commission should apply" for each of the three criteria. After receiving the parties' responses and reviewing the evidence, the Commission decided in the Concluding Order that "further defining the standards for each of the requirements is unnecessary and may unreasonably limit the relevant facts that interested parties may present—now or in future proceedings—for consideration under the three statutorily-mandated criteria." As the Commission had no obligation to define this criteria beyond the words of the statute, Appellants' argument on this issue is without merit.

Appellants further argue that the Commission erred as a matter of law by not imposing a threshold burden of proof on TRIP II and Staff as the participants who supported the Greenway's existing toll rates. Appellants, however, did not preserve this alleged error for appeal because they never argued this point to the Commission, thus failing to provide the Commission with an opportunity "to rule intelligently on the same substantive argument that [Appellants] advance here." *Harbour v. Suntrust Bank*, 278 Va. 514, 519, 685 S.E.2d 838, 840 (2009) (citing Rule 5:25); *See* Rule 5:21(a)(10) (incorporating Rule 5:25 for appeals from the Commission). In fact, Appellants argued in their legal memoranda filed with the Commission in response to the hearing examiner's report that the hearing examiner erroneously imposed a burden of proof on

11

## C. Evidence in Support of Greenway's Existing Tolls

We now turn to Appellants' arguments that the Commission erred in its factual findings that the Greenway's existing toll rates continue to satisfy the Code § 56-542(D) criteria while Appellants' proposed lower rates did not. We disagree. The record provides evidentiary support for the Commission's findings, which fall squarely within the province of its expertise.

### 1.

Appellants first contend the evidence does not support the Commission's finding that the existing toll rates "will not materially discourage use of the [Greenway] by the public" as required under subsection (D)'s second criterion.[12] *Id.*

Under this requirement, the Commission assessed the impact that the existing toll rates have on the Greenway's usage by the public. In doing so, the Commission appropriately determined that in order for the tolls to "materially" discourage the Greenway's usage, they would need to discourage traffic "to a significant extent or degree" (quoting Webster's Third New International Dictionary 1392 (1993) for the plain meaning of "materially"). *See Laws v. McIlroy*, 283 Va. 594, 604, 724 S.E.2d 699, 705 (2012) ("When . . . a statute contains no express

Appellants, reasoning that the Commission's Initiating Order made no provision for such burden on any of the participants. The Commission agreed with Appellants and "placed [no] threshold burden on any participant" in rendering its decision, as explained in the Concluding Order, because the Initiating Order "did not impose a burden of proof on any participant for purposes of this proceeding." Under approbate-reprobate principles, as we recently explained, "a litigant may not take 'successive positions in the course of litigation that are either inconsistent with each other or mutually contradictory.'" *Babcock & Wilcox Co. v. Areva NP, Inc.*, 292 Va. 165, 204, 788 S.E.2d 237, 258 (2016) (quoting *Lewis v. City of Alexandria*, 287 Va. 474, 480, 756 S.E.2d 465, 469 (2014)). Accordingly, will we not consider the merits of Appellants' argument on this issue.

[12] Appellants do not challenge the Commission's finding under subsection (D)'s first criterion that the Greenway's existing toll rates should be maintained because, in part, they are reasonable to the Greenway's users in relation to the benefit they obtain from it. Rather, Appellants limit their challenge to the Commission's findings under subsection (D)'s second and third criteria.

definition of a term, the general rule of statutory construction is to infer the legislature's intent from the plain meaning of the language used." (citation and internal quotation marks omitted)).

Evidence presented by TRIP II and Staff show that the existing toll rates were not significantly discouraging the public's use of the Greenway. Specifically, they offered, inter alia, studies through expert witnesses showing that toll rate increases on the Greenway have resulted in statistically low rates of traffic diversion to alternative routes. Their respective experts reached this assessment in these studies using the methodology known as a "regression analysis," which isolated the effect of the single factor, increased tolls, on the Greenway's usage apart from the effects of other extrinsic factors such as fuel prices, economic conditions and improvements in alternative routes over the relevant time period. Based on this analytical approach, the studies indicated that decreases in traffic on the Greenway between 2007 and 2012 were not due to periodic increases in toll rates to any significant degree. Furthermore, it was undisputed that there had been an increase in the Greenway's traffic beginning in 2012 and continuing into 2013, following what was then the most recent toll rate increases approved by the Commission. The expert witnesses for both TRIP II and Staff thus concluded that the rate increases for the Greenway had been highly "inelastic," meaning an increase in rates caused an insignificant decrease in traffic (i.e., demand).[13]

Staff, through its same expert witness, also presented a "level of service" analysis as additional evidence that the Greenway's existing toll rates were not "materially discourag[ing] its use" by the public. This analysis involved determining whether the toll rates were set at levels

_____

[13] The study presented by TRIP II's expert showed that for every 1 percent increase in tolls, demand only decreased by 0.139 percent for peak periods and 0.312 for off-peak periods. Rendering similar results, the study presented by Staff's expert showed that for every 1 percent increase in tolls, demand only deceased by 0.242 percent for morning peak periods, 0.063 percent for afternoon peak periods, and 0.307 percent for off-peak periods.

13

that facilitate operation of the Greenway at its designated capacity, as established through TRIP II's "Comprehensive Agreement" with the Virginia Department of Transportation executed at the Greenway's inception.[14] Staff's expert concluded that the Greenway was operating within its designed capacity, meaning its toll rates had not been raised to a point that it was being "under-utiliz[ed]" —that is, to a point of "materially discourag[ing] its use."

By contrast, Ramadan, in advocating a reduction in the Greenway's toll rates, presented the results of a study conducted by one of his own expert witnesses using a different methodology referred to as a "screenline traffic count data" (market share) analysis. This consisted of examining changes from 2007 to 2012 in the Greenway's share of the Loudoun County east-west traffic market in comparison to alternative routes (Route 7 and Sycolin Road). This expert witness testified that the results of his analysis showed that, during that time period, the Greenway lost a significant share of its traffic to those routes as its toll rates increased, indicating that the existing rates materially discourage its use and thus fail to comply with Code § 56-542(D). He also challenged the validity of TRIP II's and Staff's regression analyses, while the expert witness who conducted the regression analysis for TRIP II testified that a screenline analysis is "a broad aggregate measure of traffic that you can't use for measuring [traffic] diversion as a result of . . . a change in toll price on a road like the Greenway."

In finding that the Greenway's existing toll rates "will not materially discourage use of the roadway by the public within the meaning of [Code § 56-542(D)]," the Commission explicitly found TRIP II's and Staff's evidence consisting of the "regression" and "level of service" analyses was persuasive. At the same time, the Commission was unpersuaded by

---

[14] *See* Code § 56-544 (B) (setting forth requirements for content of agreement concerning VDOT's oversight authority in the design, construction, maintenance and operation of the Greenway).

14

Ramadan's evidence, "conclud[ing] that [his] screenline/market share analyses do not adequately consider alternative causes for traffic migration and/or do not show that [TRIP II's] tolls will materially discourage use of the roadway." The Commission was entitled to interpret this conflicting evidence and to decide the weight to afford it. *See, e.g., GTE South Inc. v. AT&T Commc'ns of Va., Inc.*, 259 Va. 338, 344, 527 S.E.2d 437, 441 (2000); *Shenandoah Sav. & Loan Ass'n v. Front Royal Sav. & Loan Ass'n*, 220 Va. 718, 722, 261 S.E.2d 325, 328 (1980); *Southern Ry. Co. v. Commonwealth*, 193 Va. 291, 298, 68 S.E.2d 552, 557 (1952). Accordingly, there was evidentiary support for the Commission's finding that the existing toll rates met the second requirement of subsection (D).

2.

Finally, Appellants assert the Commission erred in finding that the Greenway's existing toll rates provide "the operator no more than a reasonable return" as required under the third criterion of Code § 56-542(D). In making this assertion, Appellants focus only on the Commission's subsidiary finding that TRIP II's "partners have never received any return on their investment in the Greenway." From there, Appellants argue that the Commission, in fact, "did not address the reasonableness of the return TRIP II is receiving on its current toll rates." Instead, according to Appellants, "[t]he Commission merely noted that the operator's investors have not received any distributions in the way of profits, and concluded that the tolls therefore provide no more than a reasonable return. This conclusion by the Commission is a *non sequitur*."

A more thorough review of the Concluding Order, however, shows that this is an incorrect assessment of the Commission's actual analysis and related findings underlying its ultimate finding that the Greenway's existing tolls met the third requirement of subsection D. As

15

support for this finding, the Commission cites to, among numerous other parts of the evidence of record it credited, the testimony of TRIP II's chief financial officer, who explained that TRIP II has not operated at a profit since it was opened. Similarly, the Commission pointed to the testimony of a deputy director in the Commission's Division of Utility Accounting and Finance, who, in testifying for Staff, explained that TRIP II had reported a loss every year of its existence. The record also supports the Commission's finding that Appellants' proposed reduced toll rates "would not provide sufficient revenues for [TRIP II] to meet its debt obligations and could jeopardize TRIP II's overall financial integrity." Specifically, as the Commission further found, evidence showed that "Ramadan's proposed annual revenue requirement of $57.142 million would fall approximately $4.352 million short of meeting TRIP II's 2015 debt service obligation (approximately $61.5 million), and would not allow TRIP II to recover any of its operational and maintenance costs." It was in this context that the Commission then addressed the fact that constitutional issues, under the "Takings Clause" in the Fifth Amendment to the United States Constitution, would arise if the Greenway's toll rates were lowered, as Ramadan requested, "in a manner that prohibits [TRIP II] from recovering its prudently incurred operating costs and debt obligations."[15]

Considering this evidence along with other evidence cited and relied upon by the Commission, including but in no way limited to the fact that TRIP II's partners have received no

---

[15] *See Federal Power Comm'n v. Hope Natural Gas Co.*, 320 U.S. 591 603 (1944); *Bluefield Water Works & Improvement Co. v. Public Serv. Comm'n*, 262 U.S. 679, 692-93 (1923); *Stone v. Farmers' Loan & Trust Co.*, 116 U.S. 307, 331 (1886); *City of Portsmouth v. Virginia Ry. & Power Co.*, 141 Va. 44, 51, 126 S.E. 366, 366, 368 (1925) (cited by Staff in its legal memorandum submitted to hearing examiner as authority for constitutional principle that utility "rates, fares, or tolls must be high enough so a company is allowed to recover its prudently incurred operating costs; its investors can earn a reasonable return on their investment commensurate with the returns earned by other companies having comparable risk; and the financial integrity of the company is not jeopardized so it can maintain its credit and attract capital").

return on their investment, the Commission explicitly found that the Greenway's existing toll rates "will provide *TRIP II* no more than a reasonable return as determined by the Commission." (Emphasis added.) We thus reject Appellants' assertion that the Commission simply and mistakenly equated partnership distributions with a "reasonable return" to the operator under subsection D. Indeed, as Staff correctly argues on brief, TRIP II's and Staff's evidence in this case showed "that TRIP II's inability to provide a return to its partners was due to the fact that TRIP II itself has never earned a return. In other words, the operator has never earned a return and, as a result, neither has its partners." Therefore, we conclude there was also evidentiary support for the Commission's finding under the third requirement of section (D).

## III. CONCLUSION

For the foregoing reasons, we affirm the Commission's Concluding Order in this matter that ended its investigation of the toll rates for the Greenway without substituting new rates under the authority of Code § 56-542(D).

*Affirmed*.