Present:  Kinser, C.J., Lemons, Millette, McClanahan and Powell, JJ., and Russell and Lacy, S.JJ.

APPALACHIAN POWER COMPANY

v.  Record No. 120394                OPINION BY SENIOR JUSTICE
                                     ELIZABETH B. LACY
STATE CORPORATION COMMISSION,        November 1, 2012
ET AL.

FROM THE STATE CORPORATION COMMISSION

In this appeal, we consider whether the State Corporation Commission properly construed and applied Code § 56-585.1(A)(5)(e) to deny rate adjustment clause recovery for certain costs incurred by Appalachian Power Company ("APCO" or "the Company").

Background

Prior to 1999, the State Corporation Commission ("the Commission") determined the rates electric utility companies charged consumers pursuant to Chapter 10, Article 2 of Title 56, Code §§ 56-234 through -245.1:1.  Under that regulatory regime, the rates could be changed following a review initiated by the Commission or upon an application filed by an electric utility. The Commission had broad discretion in selecting the methodology for determining rates including the rate of return on equity guided by the principle that the rates were to be just and reasonable, allowing the utility a reasonable return and imposing just rates on the consumer.  Code § 56-235.2.

In 1999, the General Assembly enacted the Virginia Electric Utility Restructuring Act, former Code §§ 56-576 et seq., which was designed to deregulate parts of the electric utility industry and introduce competition among the providers of electric generation.  1999 Acts ch. 411; Potomac Edison Co. v. State Corp. Comm'n, 276 Va. 577, 580, 667 S.E.2d 772, 773 (2008).  The legislation established a transition period, during which the base rates of electric utilities were held constant or "capped."[1]  However, utilities were allowed to file annual rate applications to recover incremental costs incurred for system reliability and for compliance with governmental environmental laws or regulations.  Code § 56-582(B)(vi); 2004 Acts ch. 827.

In 2007, the General Assembly ended its program of deregulation and enacted Code § 56-585.1 which prescribed a new regulation regime.  2007 Acts chs. 888, 933.  The new legislation reaffirmed the Commission's authority to regulate electric utility rates but prescribed certain procedures and methodologies which the Commission must follow in establishing such rates.

---

[1] The initial transition period extended from January 1, 2001 to July 1, 2007, but was extended to December 31, 2008, "unless sooner terminated by the Commission pursuant to the provisions of subsection C; however, rates after the expiration or termination of capped rates shall equal capped rates until such rates are changed pursuant to other provisions of this title."  Code § 56-582(F); 2007 Acts chs. 888, 933.

Under the 2007 regulatory regime each utility was required to undergo an initial review by the Commission in 2009. In this proceeding, the Commission conducted a review of each company's 2008 performance, set a rate of return and determined the rates to be charged going forward "until such rates are adjusted." Code § 56-585.1(A). The methodology for adjusting rates in this initial proceeding was set out in the statute. Id.

The legislation requires that, after the initial review proceeding, the performance of electric utility companies is reviewed every two years. In the biennial review, the Commission considers the company's rates, terms, and conditions for the provision of generation, distribution and transmission services for the preceding two years. Id. While the biennial review has some characteristics of the Chapter 10 base rate proceeding, the statute imposes significant limitations on the Commission's discretion in adjusting rates. Id.

If the utility earned more than 50 basis points below the authorized fair combined rate of return, the Commission "shall order increases to the utility's rates necessary to provide the opportunity to fully recover the costs of providing the utility's services and to earn not less than such fair combined rate of return . . . ." Code § 56-585.1(A)(8)(i). If the utility earned more than 50 basis points above the fair combined rate of return established by the Commission, 60 percent of the

3

amount of the earnings above the fair rate of return must be credited to customers' bills and the electric utility may retain the remaining 40 percent of the excess earnings. Code § 56-585.1(A)(8)(ii). The Commission may not order a rate reduction unless it finds that the electric utility earned more than 50 basis points above the fair rate of return in two consecutive biennial reviews. Code § 56-585.1(A)(8)(iii).

The 2007 legislation also creates a new proceeding allowing a utility to petition the Commission for approval of a rate adjustment clause for the "timely and current" recovery from customers for costs incurred in certain identified programs. Code §§ 56-585.1(A)(4) through (6). As relevant here, the Commission is directed to make rate adjustments allowing a company to recover projected and actual costs of projects which the Commission finds necessary to comply with state or federal environmental laws or regulations. Code § 56-585.1(A)(5)(e). Once granted, a rate adjustment clause is combined with the company's costs, revenues and investments in a biennial review proceeding if there are adjustments to the rates until the amounts of the adjustment clause are fully recovered. Code § 56-585.1(A)(3).

### Proceedings

Pursuant to the regulatory review regime outlined above, APCO filed its petition for its initial review in 2009. In that

4

proceeding APCO sought a rate increase of approximately $167 million based on the Company's performance in the 2008 test year.  The Commission's order implementing APCO's adjusted rates included recovery for some, but not all the amounts sought by APCO for compliance with various state and federal environmental laws and regulations.  These rates became effective in August of 2010.  In re Appalachian Power Co., Case No. PUE-2009-00030, (July 15, 2010).[2]

In March of 2011, APCO filed a petition pursuant to Code § 56-585.1(A)(5)(e), seeking a rate adjustment clause to recover $77 million, which it asserted represented the 2009 and 2010 actual costs incurred by the Company, but not recovered through base rates, to comply with state and federal environmental requirements.[3]  The recovery APCO sought was incurred either directly by APCO for environmental projects required for compliance or through the capacity equalization charges it paid to its affiliates which included costs incurred by the

---

[2] A copy of this order may be found using the Commission's docket search website, http://docket.scc.state.va.us/CyberDocs/Libraries/Default_Library/Common/frameviewdsp.asp?doc=103033&lib=CASEWEBP%5FLIB&mimetype=application%2Fpdf&rendition=native (last visited September 28, 2012).

[3] APCO contemporaneously made its biennial filing pursuant to Code § 56-585.1(A)(3).  That proceeding is not at issue in this appeal.

5

affiliates for compliance with state or federal environmental laws or regulations.[4]

The Commission published an order calling for notice and hearing, scheduled public hearings associated with the petition, established a procedural schedule for the case, and assigned a hearing examiner to conduct all further proceedings on behalf of the Commission. A number of parties filed notices of participation including the Old Dominion Committee for Fair Utility Rates and the Office of the Attorney General Division of Consumer Counsel, appellees in this appeal. Public hearings and evidentiary hearings were conducted by the Commission and the hearing examiner.

In his report and recommendations to the Commission, the hearing examiner concluded that Code § 56-585.1(A)(5)(e) entitled APCO to recover the environmental compliance costs it sought but, based on the testimony and evidence received, the hearing examiner recommended that the appropriate amount of

---

[4] Capacity equalization charges are charges APCO pays to acquire supplemental generation capacity to meet its native load demand. The supplemental generation is acquired from facilities owned by APCO's affiliates which, like APCO, are subsidiaries of American Electric Power Company, Inc. The amount of the capacity equalization charges is determined through an Interconnection Agreement between APCO and its affiliates approved by the Federal Energy Regulatory Commission. The Interconnection Agreement sets out a formula to show the affiliates' costs of owning, operating and maintaining the generation facilities that supply the capacity purchased by APCO.

revenue recovery should be $63.3 million rather than the approximately $77 million sought by APCO.[5]

The Commission rejected the hearing examiner's construction and application of Code § 56-585.1(A)(5)(e) and held that the section did not authorize recovery of those costs which the Company had already been given the opportunity to recover through its base rates.

The Commission also concluded that, even if APCO was entitled to recover actual compliance costs associated with categories of projects included in, but not recovered by the base rates, it could not recover the $27.3 million alleged as embedded in the capacity equalization charges because APCO failed to establish the actual amount of the environmental costs embedded in those charges.

The Commission entered an order allowing APCO to recover $30 million for actual environmental compliance costs over a one-year period and denying recovery of the remaining approximately $6 million APCO claimed it incurred directly but did not recover through base rates to comply with environmental regulations and laws and approximately $27.3 million alleged to be environmental compliance costs embedded in the capacity adjustment charges paid to its affiliates.  APCO filed an appeal

_____

[5] APCO did not challenge the amount of recovery recommended by the hearing examiner before the Commission and does not do so in this appeal.

7

with this Court pursuant to Rule 5:21(a) naming the Commission and intervenors, Old Dominion Committee for Fair Utility Rates and the Office of the Attorney General Division of Consumer Counsel, as appellees.

Discussion

1. Application of Code § 56-585.1(A)(5)(e)

APCO raises three assignments of error containing a number of subpoints.  The overarching challenge which APCO advances is that the ratemaking methodology adopted by the Commission to implement Code § 56-585.1(A)(5)(e) ignored the plain and unambiguous language of the statute.

The Constitution of Virginia vests administrative, judicial and legislative powers in the Commission in the exercise of the control and regulation of public utility companies.  Potomac Edison, 276 Va. at 586, 667 S.E.2d at 777.  In considering the appropriate standard of review to be applied when reviewing a Commission decision, we begin by giving a decision in which the Commission has exercised its expertise a presumption of correctness.  Id.  Our standard of review, however, will depend on the nature of the decision under review.  Id.  The decision under review here is the Commission's construction and application of Code § 56-585.1(A)(5)(e).  This statutory construction issue is a question of law reviewed by this Court

8

de novo.  Christian v. State Corp. Comm'n, 282 Va. 392, 396-97, 718 S.E.2d 767, 769 (2011).

The Commission and other appellees, however, assert that we have limited the de novo standard of review in certain cases citing opinions in which we have recited that "the practical construction given by the Commission to a statute it is charged with enforcing is entitled to great weight by the courts and in doubtful cases will be regarded as decisive." Piedmont Envtl. Council v. Virginia Elec. & Power Co., 278 Va. 553, 563, 684 S.E.2d 805, 810 (2009) (citations and internal quotation marks omitted); Appalachian Voices v. State Corp. Comm'n, 277 Va. 509, 516, 675 S.E.2d 458, 461 (2009); Commonwealth v. Appalachian Elec. Power Co., 193 Va. 37, 45, 68 S.E.2d 122, 127 (1951). Acknowledging that an agency cannot advance an interpretation that contradicts the statute, Davenport v. Little-Bowser, 269 Va. 546, 554-55, 611 S.E.2d 366, 370-71 (2005)(citing Superior Steel Corp. v. Commonwealth, 147 Va. 202, 206, 136 S.E. 666, 667 (1927)), the Commission suggests that our prior cases require that we treat the Commission's decision as "decisive."[6]  We disagree with the suggestion that in this case the Commission's statutory interpretation must be considered as "decisive."

---

[6] The arguments raised by the other appellees in this appeal are substantially similar to those raised by the Commission.

9

The Commission's statutory construction was first characterized as "decisive" in <u>Appalachian Elec. Power Co.</u>, 193 Va. at 45, 68 S.E.2d at 127. In that case, the Commission construed a tax statute and held that electric utilities doing business in this state could deduct certain monies derived from operations in other states before computing their liability for the tax at issue. The Commission had applied this construction of the statute for approximately a decade. After concluding that the statute was ambiguous, the Court not only described the Commission's interpretation as being decisive, it explained the reason for ascribing this level of deference to the Commission's decision in that case. <u>Id.</u> Citing a number of previous cases, the Court explained that the "[l]egislature is presumed to be cognizant of such construction and when long continued, in the absence of legislation evincing a dissent, the courts will adopt that interpretation."[7] <u>Id.</u> at 45-46, 68 S.E.2d at 127. In that

---

[7] <u>Miller v. Commonwealth</u>, 180 Va. 36, 41-42, 21 S.E.2d 721, 723 (1942)(public official's statutory construction accepted by bench and bar for long period of time is canon of construction, unless paramount reason is found for change in construction); <u>Commonwealth v. Stringfellow</u>, 173 Va. 284, 289, 4 S.E.2d 357, 359 (1939)(great weight afforded tax department's long-standing and uniform statutory construction); <u>Hunton v. Commonwealth</u>, 166 Va. 229, 242, 183 S.E. 873, 878 (1936)(court defers to tax official's practical construction of tax laws when, for over 30 years, neither legislature nor tax commission recommended change in law due to constitutional conflict); <u>Smith v. Bryan</u>, 100 Va. 199, 204, 40 S.E. 652, 654 (1902)(court regards public official's construction of statute of doubtful import as correct

case, as in others using this principle, the General Assembly had not altered the agency's interpretation although it had the opportunity to do so during the intervening years.  Id.

The Commission's construction of the statute in this case is not a long-standing one and is not a construction which the General Assembly has had the opportunity to consider.  Thus, the presumption of legislative acquiescence does not apply.  Compare Beck v. Shelton, 267 Va. 482, 492, 593 S.E.2d 195, 200 (2004)(when General Assembly was aware of interpretation of statute embodied in an Opinion of the Attorney General for five years and "fail[ed] to make corrective amendments" to statute during that time, such "failure . . . evinces legislative acquiescence in the Attorney General's view")(quoting Browning-Ferris, Inc. v. Commonwealth, 225 Va. 157, 161-62, 300 S.E.2d 603, 605-06 (1983)).

In any case involving statutory construction we begin with the language of the statute.  Code § 56-585.1(A)(5)(e) provides in pertinent part:

> 5.  A utility may at any time, after the
> expiration or termination of capped rates, but
> not more than once in any 12-month period,
> petition the Commission for approval of one or
> more rate adjustment clauses for the timely and
> current recovery from customers of the
> following costs:

---

when that construction remains unchanged by legislature or judicial decision over time).

11

. . . .

> e.  Projected and actual costs of projects that the Commission finds to be necessary to comply with state or federal environmental laws or regulations applicable to generation facilities used to serve the utility's native load obligations.  The Commission shall approve such a petition if it finds that such costs are necessary to comply with such environmental laws or regulations . . . .

The Commission contends that because Code § 56-585.1(A)(5)(e) "is silent on the intersection of base rate recovery and adjustment clause recovery," subsection (C) of Code § 56-585.1 requires the Commission to adopt a "ratemaking methodology" to implement the adjustment rate clause section which will produce just and reasonable rates as directed in Chapter 10 of Title 56 of the Code.[8]  Noting that nothing in the statute gives a utility the right to recover all of its actual environmental compliance costs, the Commission reasons that by including such costs in its base rates, a company has the opportunity to recover such costs, which can be supplemented by costs for projects not already included in the base rates.  This

---

[8] Code § 56-585.1(C) provides:
Except as otherwise provided in this section, the Commission shall exercise authority over the rates, terms and conditions of investor-owned incumbent electric utilities for the provision of generation, transmission and distribution services to retail customers in the Commonwealth pursuant to the provisions of Chapter 10 (§ 56-232 et seq.), including specifically § 56-235.2.

12

result, the Commission concludes, is "fully supported by the plain language of the Act."

The Commission also contends that the ratemaking methodology it chose is consistent with Code § 56-585.1 when read as a whole. Subdivision (7) of Code § 56-585.1(A) requires the Commission to consider a petition for a rate adjustment clause for environmental compliance costs "on a stand-alone basis without regard to the other costs, revenues, investments, or earnings of the utility." Thus, the Commission continues, the base rate and rate adjustment clause proceedings are separate proceedings and incorporation of base rate items when setting adjustment clause rates "would exceed the Commission's authority in adjustment clause proceedings." According to the Commission, other "costs, revenues, investments, or earnings" are appropriately disregarded by limiting the adjustment clause rates only to environmental costs not already included in base rates.

The primary objective in statutory construction is to determine and give effect to the intent of the legislature as expressed in the language of the statute. Halifax Corp. v. First Union Nat'l Bank, 262 Va. 91, 99-100, 546 S.E.2d 696, 702 (2001). When a statute is unambiguous, we must apply the plain meaning of that language. Id. If the statute is subject to more than one interpretation, we must apply the interpretation

13

that carries out the legislative intent.  Brown v. Lukhard, 229 Va. 316, 321, 330 S.E.2d 84, 87 (1985).  Rules of statutory construction prohibit adding language to or deleting language from a statute.  BBF, Inc. v. Alstom Power, Inc., 274 Va. 326, 331, 645 S.E.2d 467, 469 (2007).

The statute quoted above clearly states the intent of the legislature.  It states that the Commission "shall" approve a utility's petition for a rate adjustment clause filed pursuant to Code § 56-585.1(A)(5)(e) if the three conditions set out in the statute are met: (1) only one petition for a rate adjustment clause seeking recovery under the section is filed in any 12-month period; (2) the costs are actual or projected costs; and (3) the Commission finds that the costs were necessary to comply with state or federal environmental laws or regulations.  Further, the statute states that the purpose of the rate adjustment clauses is to allow for the "timely" and "current" recovery of qualified costs.  Code § 56-585.1(A)(5).  The rate adjustment clause proceeding stands in direct contrast to the more lengthy base rate proceeding, which under Code § 56-585.1 only occurs every two years.[9]

There is no dispute that the costs APCO seeks to recover were incurred in qualified environmental projects and that these

---

[9] A utility company may still apply for temporary rate increases at any time.  Code §§ 56-585.1(B) and -245.

14

costs have not been recovered and cannot be recovered in the future through the mechanism of the base rates. Yet, the ratemaking methodology adopted by the Commission prevents the recovery of the very costs which the statute identifies as being recoverable through a rate adjustment clause. Providing a utility with the opportunity to recover environmental compliance costs is inconsistent with the statutory mandate providing for the timely and current actual recovery of such costs which, in this case, means such costs will never be recovered.

The Commission's methodology not only contradicts the intent of the legislature reflected in the statute, it effectively adds a fourth condition to the statute: the costs sought were not costs that could have been recovered in the Company's base rates. Adding words to a statute in this manner violates a well-established tenet of statutory construction. BBF, Inc., 274 Va. at 331, 645 S.E.2d at 469 (courts, in construing a statute, must apply its plain meaning, and "we are not free to add [to] language, nor to ignore language, contained in statutes.")(quoting SIGNAL Corp. v. Keane Fed. Sys., 265 Va. 38, 46, 574 S.E.2d 253, 257 (2003)).

The Commission's reliance on the authority contained in subsection (C) of Code § 56-585.1 as support for its ratemaking methodology is misplaced. That subsection specifically makes the Commission's exercise of its Chapter 10 ratemaking authority

15

subject to the other provisions of Code § 56-585.1.  Therefore, any ratemaking methodology which the Commission adopts to implement Code § 56-585.1(A)(5)(e) may not contradict that section.  As pointed out above, the ratemaking methodology adopted by the Commission conflicts with the intent and the plain language of Code § 56-585.1(A)(5)(e).

Finally, the directive that the Commission consider a petition for a rate adjustment clause under Code § 56-585.1(A)(5)(e) on a stand-alone basis does not require the type of separation the Commission suggests.  Indeed, even under the Commission's methodology, reference to a utility's base rates would be required to determine whether the projects which incurred the actual or projected costs sought to be recovered were included in the computation of the base rates.  Furthermore, reference to base rate revenues would be necessary to ensure that the amount requested as an actual unrecovered cost had in fact not already been recovered.

Rather, the "stand-alone" language in subdivision (7) of subsection (A) of the statute means that the utility's costs, revenues, investments or earnings should not be considered when determining the amount of the rate adjustment clause.  Nothing in the language of this subdivision suggests or requires that actual costs incurred in environmental compliance projects may

16

not include costs associated with such projects if the projects were included in formulating base rates.

For these reasons, we hold that Code § 56-585.1(A)(5)(e) allows recovery of unrecovered costs incurred by a utility for environmental compliance projects necessary to serve the utility's native load obligations even if the projects which incurred those costs were included in the utility's base rates.

### 2. Recovery of Compliance Costs Embedded in Capacity Equalization Charges

The Commission also denied recovery of the environmental compliance costs embedded in the capacity equalization charges that APCO sought because the evidence did not "accurately reflect actual 'costs of projects' used to serve the Company's native load customers."  APCO has assigned error to this alternate holding and we now address that issue.

APCO argues that it produced sufficient evidence to support recovery for the environmental compliance costs embedded in the capacity equalization charges.  APCO points to uncontradicted evidence that a portion of the capacity payments included costs that its affiliates incurred for projects required to comply with environmental laws and regulations and evidence of the amount of capacity equalization charges APCO paid to its affiliates during the time periods in question.  APCO also relies on the testimony and exhibits of its witnesses and

17

Commission Staff which included computations or estimates of the portion of the capacity equalization charges attributable to environmental compliance costs incurred by its affiliates. APCO asserts that the use of different formulae by its witnesses and Commission Staff to arrive at the amount of environmental compliance costs embedded in the capacity equalization charges did not absolve the Commission from weighing the evidence and determining a proper recovery amount. Finally, APCO asserts that the evidence and calculations it presented were "identical in form, detail and scope" to evidence accepted by the Commission in prior cases under Code § 56-582 during the former deregulation transition period.

The Commission, in its alternate holding denying these costs, noted that although Code § 56-585.1(A)(5)(e) allows recovery for actual and projected costs, in this proceeding APCO sought recovery of costs it identified as actual, not projected costs. The Commission's ruling was based on its determination that nothing in the testimony or calculations regarding the capacity equalization charges paid by APCO or the Interconnection Agreement contains any identification or specific quantification of the amount of environmental costs embedded in those charges. In applying the statutory language referring to "actual costs," the Commission held that estimates of environmental compliance costs produced in this case "did not

18

sufficiently demonstrate [the] actual costs" as required by the statute. The Commission also noted that using "one of the varying calculations in the record could result in a double recovery of costs through the Company's base rates and adjustment rate clauses."

The Commission's decision under review here is that the evidence was insufficient to prove "actual costs." This finding of fact will not be reversed unless it is "contrary to the evidence or without evidence to support it." Mutual Sav. & Loan Ass'n v. Commonwealth, 212 Va. 557, 559, 186 S.E.2d 13, 14 (1972).

In its alternate holding, the Commission applied the plain language of the statute, which in this case limits rate adjustment clauses to "actual costs," and held that the estimates of environmental compliance costs embedded in the capacity equalization charges did not meet the statutory requirement. Acceptance of estimates in proceedings brought under other statutes which did not require evidence of "actual costs" does not require or suggest that estimates should be sufficient in this proceeding. Furthermore, APCO's argument that the Commission failed to weigh the evidence and instead ignored it is without merit. The record is clear that the Commission considered the evidence and found that it did not satisfy the statutory requirement of "actual costs."

19

Based on this record, we cannot say the Commission's decision is contrary to the evidence or without evidentiary support.

## Conclusion

In summary, in this appeal APCO sought recovery of $33.3 million in environmental compliance costs that the Commission denied.  For the reasons stated, we hold that APCO is entitled to a rate adjustment clause for recovery of actual costs it directly incurred for environmental compliance in 2009 and 2010, but did not recover through its base rates.  We will reverse that portion of the Commission's decision denying recovery of environmental compliance costs on the basis that those costs are connected with projects included in APCO's base rates which the Company had the opportunity to recover.

We will affirm that portion of the Commission's decision denying APCO recovery of environmental compliance costs alleged to be embedded in the capacity equalization charges APCO paid to its affiliates in 2009 and 2010.  Accordingly, we will remand the case to the Commission for further proceedings consistent with this opinion.

Reversed in part, affirmed in part and remanded.

20